{¶ 13} I respectfully dissent and would deny the requested writ of mandamus.
 {¶ 14} In my view, this case is not similar to State ex rel. Griffithv. Radix Wire Co., 161 Ohio App.3d 30, 2005-Ohio-2200, 829 N.E.2d 340, affirmed, State ex rel. Griffith v. Indus Comm., 109 Ohio St.3d 479,2006-Ohio-2992, 849 N.E.2d 28, upon which the magistrate and majority rely. In Griffith, the commission relied solely on conjecture when it determined that the claimant worked outside of his light-duty restrictions during the time period for which he received TTD. In affirming this court's decision, the Supreme Court of Ohio noted, "Griffith's ability to engage in work activity between December 19, 2001, and January 24, 2002, is relevant to the period after January 25, 2002, only if the activity conflicts with his medical restrictions and his purported inability to return to his former job. The commission never made that finding. Moreover, the only two activities enumerated in the commission's order — answering phones and running errands — are not incompatible with Griffith's light-duty restrictions." State ex rel.Griffith v. Indus Comm., 109 Ohio St.3d 479, 2006-Ohio-2992,849 N.E.2d 28, ¶ 12. In the present case, relator's ability to engage in work activity at the YMCA is relevant to the later periods for which he received TTD because it conflicts with his purported inability to return to his former job. For this reason, *Page 5 
the commission did not abuse its discretion in concluding that his receipt of TTD was improper.
 {¶ 15} Moreover, there was some evidence supporting the commission's factual finding that relator committed civil fraud by submitting 12 C-84 applications for TTD, each containing false information regarding the last date of work. In these C-84s, relator and his treating physician certified that he was totally disabled from work for the relevant time period. On each C-84, the claimant's portion of the form concluded with the declaration: "* * * I have answered the foregoing questions truthfully and completely. I am aware that any person who knowingly makes a false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by BWC or who knowingly accepts compensation to which that person is not entitled is subject to felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both."
 {¶ 16} After hearing relator's testimony that he "forgot" about working at the YMCA, the commission evaluated relator's credibility and determined that he intentionally submitted information that he knew to be false. Notably, the commission found other portions of relator's testimony — such as the date he ceased working for the YMCA — to be credible. With respect to all the testimony before it, the commission, not this court, determines the credibility of witnesses and weighs the evidence. Indeed, in State ex rel. Allied Holdings, Inc. v. Meade, Franklin App. No. 06AP-1029, 2007-Ohio-5010, ¶ 27, this court reaffirmed the principle that, "[i]t is not an abuse of discretion to determine that certain testimony is credible [or not]. It would not be appropriate for this court to review claimant's testimony and determine whether or not this court finds his testimony was *Page 6 
credible. Instead, this court looks to see whether there is `some evidence' in the record upon which the commission relied and which the commission cited in its decision."
 {¶ 17} Our function is to determine whether the commission abused its discretion, and we only grant a writ of mandamus where the relator demonstrates a clear legal right to the requested relief. We do not reweigh the evidence and we do not determine credibility. For these reasons, I would sustain the commission's objections and deny the requested writ of mandamus. Because the majority has determined otherwise, I respectfully dissent. *Page 7 
APPENDIX A
IN THE COURT OF APPEALS OF OHIO
TENTH APPELLATE DISTRICT
 MAGISTRATE'S DECISION
Rendered July 10, 2008
Gibson Law Offices, and Joseph E. Gibson, for relator.
Nancy H. Rogers, Attorney General, and Douglas R. Unver, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 18} Relator, Raymond Goodwin, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order that found his receipt of temporary total disability ("TTD") compensation from June 6, 2005 through November 9, 2006 was improper *Page 8 
based upon a finding that relator had engaged in remunerative work activity during that time, and further finding that relator had committed fraud. Findings of Fact:
 {¶ 19} 1. Relator sustained a work-related injury on October 1, 2001, and his claim was originally allowed for "lumbosacral sprain."
 {¶ 20} 2. On April 18, 2005, relator's claim was amended to allow the additional condition of "lumbar spinal stenosis."
 {¶ 21} 3. Relator's treating physician, David Heuser, D.C., certified a period of temporary total disability beginning November 1, 2004 through an estimated return-to-work date of July 5, 2005. The certification was based on the allowed conditions. Objectively, Dr. Heuser noted relator had lumbar spasms with marked restricted lumbar range of motion. Dr. Heuser also indicated that relator was a candidate for vocational rehabilitation services focusing on a return to work and authorized physical therapy three times a week for six weeks.
 {¶ 22} 4. By order mailed June 3, 2005, the Ohio Bureau of Workers' Compensation ("BWC") granted relator's request for TTD compensation beginning November 1, 2004 based upon the May 27, 2005 report of Dr. Scharf who noted that relator's claim had been recently allowed for spinal stenosis; he had ongoing back pain which has not been alleviated with the use of analgesics, physical therapy conditioning and work hardening. Dr. Scharf opined that the period of disability was warranted because relator indicated that his condition is worse with any effort.
 {¶ 23} 5. The record contains active physical therapy evaluation notes signed by therapist Susan Fisher. On the first page of her evaluation, Ms. Fisher noted that relator *Page 9 
had "worked 1 [time] at YMCA 6/6 — 6/11/05." Following her evaluation of relator, Ms. Fisher set out the following goals and objectives:
 * * * Tolerate 1 — 2 hours of program 3 days/week.
 * * * Independent performing exercise program.
 * * * Perform 2 sets of strengthening exercises.
 * * * Demonstrate 20 minutes of aerobic exercises.
 * * * Use good body mechanics with exercise program.
 {¶ 24} She recommended full body physical therapy three times a week for six weeks to increase general flexibility and strength. She further recommended that the physical therapy be followed up by work conditioning three to five days a week for four to six weeks in order to increase relator's lifting capacity and his general work tolerances to return him to some type of employment.
 {¶ 25} 6. On July 29, 2005, relator was discharged from physical therapy. It was noted that the program's goals had been attained, home exercise and work therapy were recommended, and it was noted that relator's potential for improvement was good.
 {¶ 26} 7. A 90-day examination was conducted by Daniel Franklin, M.D., on August 12, 2005. In his report, Dr. Franklin noted that relator had last worked in August 2004. Further, he concluded that relator's allowed conditions had reached maximum medical improvement; he could perform sedentary to light-duty work; and vocational rehabilitation was recommended.
 {¶ 27} 8. An individualized vocational rehabilitation plan was prepared by the BWC. It was noted that relator did not currently have all the physical tolerances for the targeted jobs. As such, relator was to begin a work-hardening program five times per week and it was noted that if relator was not able to enter the job market at the end of five weeks, another three weeks of work hardening would occur. Once relator was *Page 10 
released to return to work by his treating physician, Dr. Heuser, he would participate in job seeking skills training focusing on the development of the skills necessary to obtain employment and enter a job search with the assistance of a job developer.
 {¶ 28} 9. In a note dated January 23, 2006, Dr. Heuser noted that relator was continuing a job search with his vocational rehabilitation worker and that he was pursuing job interviews. Dr. Heuser noted that relator was to see a neurosurgeon in March to determine whether surgery may improve his condition. Dr. Heuser concluded that relator should be able to work 16 to 20 hours a week and that he could continue his job search.
 {¶ 29} 10. The BWC's Special Investigations Unit ("SIU") learned that wages had been reported to the Ohio Department of Job and Family Services for relator during the second quarter of 2005. As such, the SIU pursued an investigation. The investigative summary provides:
 On July 7, 2006, SA Edwards reviewed the employment records from the Greater Dayton YMCA. According to the employment records, GOODWIN made himself available to work on March 28, 2005 by completing an application with the YMCA. Furthermore, employment records revealed GOODWIN was hired as a Building Supervisor on June 6, 2005. Per memo dated June 21, 2005, Gayle Horton, Executive Director, advised that GOODWIN had quit. GOODWIN was paid at a rate of $7.50 per hour. GOODWIN received one (1) paycheck for week ending June 26, 2005 in the amount of $249.38. This was the only check GOODWIN received from the YMCA. Also provided with the employment records was a W-2 which confirmed GOODWIN was paid $249.38 in the year of 2005 from the YMCA.
 Edwards received a call from Jenny Warner, HR Vice President, in which she clarified GOODWIN'S work tenure at the YMCA. Warner stated GOODWIN worked approximately 33 hours during the pay period from June 13, 2005 through *Page 11 
June 26, 2005. Additionally, Warner verified GOODWIN was hired as a Building Supervisor. Warner stated GOODWIN['S] duties and responsibilities included supervision of the facility and grounds.
* * *
 On December 11, 2006, Edwards interviewed GOODWIN'S Physician of Records (POR), Dr. David Heuser. * * * [A]fter reviewing the records, Dr. Heuser stated he was not aware of GOODWIN'S work activities and would not have certified TT disability. Additionally, Dr. Heuser stated he felt he had been deceived by GOODWIN in an effort to certify the period of TT.
* * *
 Edwards spoke with Warner at the YMCA in regards to the observation of GOODWIN while he was working. Warner informed Edwards she spoke with Horton. Warner informed Edwards that Horton only remembered GOODWIN was a black male and he informed her he had to resign because the job would affect his un-employment or some sort of benefits. According to Warner, Horton stated she could not remember any type of disability or complaints about pain when GOODWIN was working.
 Warner informed Edwards GOODWIN'S job duties as a building supervisor was to walk the building in case of any emergencies or to assist members with any needs they had.
 {¶ 30} 11. Because relator had signed numerous C-84 applications for TTD compensation without indicating that he had worked after August 2004, the BWC filed a motion with the commission seeking an order declaring the entire period of TTD compensation and living maintenance payments paid from June 6, 2005 through November 9, 2006 to be an overpayment. The BWC also sought a finding of fraud because relator "concealed the fact that he was actively working in order to receive Temporary Total Disability Compensation Benefits." *Page 12 
 {¶ 31} 12. A hearing was held before a district hearing officer ("DHO") on March 7, 2007 and resulted in an order granting the BWC's motion. The DHO concluded that there was an overpayment of TTD compensation from June 6, 2005 through November 9, 2006, and the DHO also determined that relator had obtained those benefits through fraud. The DHO stated that relator was employed by the YMCA in June 2005 while either alleging entitlement to TTD compensation or, in fact, receiving TTD compensation pursuant to an order from the BWC dated June 3, 2005. The DHO further found that the C-84s completed by relator after that date were falsely completed with regard to his last day worked and that these C-84s were knowingly and falsely made, that the false representations were immaterial and substantial fact upon which the BWC relied and paid him TTD compensation. The DHO also noted that relator's treating physician, Dr. Heuser, indicated that he had not been advised by relator that he had obtained employment with the YMCA and that if he had, he would not have certified those periods of disability.
 {¶ 32} 13. Relator appealed and submitted the April 21, 2007 letter from Dr. Heuser indicating that, in his opinion, any inappropriate action taken by relator with regards to his workers' compensation claim was a mistake and a result of relator not understanding how the system worked. He stated that relator had remained disabled and unable to perform sustained work activity during the time period and that he no longer believed that relator had intentionally deceived him or the BWC.
 {¶ 33} 14. Relator's appeal was heard before a staff hearing officer ("SHO") on June 8, 2007 and resulted in an order affirming the prior DHO's order in all respects. The SHO concluded: *Page 13 
 It is the order of the Staff Hearing Officer that the Bureau of Workers' Compensation motion filed 12/12/2007 requesting that the Industrial Commission find an overpayment of temporary total disability compensation benefits for the period 06/06/2005 to 11/09/2006 is granted.
 The Staff Hearing Officer finds that according to the C-84 dated 05/06/2005 the injured worker was unable to return to and perform the job duties of his position of employment for the time period 11/01/2004 to a [sic] estimated period of 06/05/2005.
 The Staff Hearing Officer finds that the injured worker begin [sic] work with YMCA of Greater Dayton on 06/06/2005 working a period of 33 hours at $7.50 per hour up to 11/09/2006.
 The Staff Hearing Officer finds that the injured worker received temporary total disability benefits during this period and that the injured worker signed the warrants which specifically ask the question as to when the injured worker last worked. The injured worker always stated his last day of work was 08/04/2004.
 It is therefore the finding of the Staff Hearing Officer that the injured worker committed civil fraud in this claim.
 It is the finding of the Staff Hearing Officer that the Bureau of Workers' Compensation relied upon the injured worker's false representation of his inability to return to his job duties as the result of the allowed conditions in this claim for the time period he received temporary total disability compensation 06/06/2005 to 11/09/2006.
 The Staff Hearing Officer finds that the injured worker had a duty to disclose his return to work as well as that the injured worker's falsification of the C-84 forms and his intent to deceived [sic] as to his disability were material to his receipt of temporary total disability compensation and the reliance upon the Bureau of Worker's Compensation until awarding that compensation.
 The Staff Hearing Officer finds that the injured worker intentionally misled the Bureau of Workers' Compensation *Page 14 
into awarding temporary total disability by falsely stating his last date of work was 08/04/2004.
 It is therefore the order of the Staff Hearing Officer that the injured worker was overpaid temporary total disability compensation from 06/06/2005 to 11/09/2006 and that the injured worker committed civil fraud in filing documents which made this period of temporary total disability compensation payable.
 The Staff Hearing Officer therefore orders the overpayment to be recouped pursuant to Ohio Revised Code 4123.511 (J).
 This order is based upon Bureau of Workers' Compensation SIU reports, C-84 submitted by the injured worker dated 12/11/2006 and signed by Dr. Heuser, the Employment and Wage Information submitted by the YMCA of Greater Dayton, Bureau of Workers' Compensation signed warrants and State ex rel. Ellis v. Indus. Comm. (2001), 92 Ohio St.3d 508.
 {¶ 34} 15. Relator appealed arguing that the BWC had failed to meet its burden of proving the exact period that relator was alleged to have worked. Relator pointed out that the BWC was only able to establish that he worked for less than 40 hours sometime in the month of [June] 2005 and had earned approximately $250. Relator also argued that his action constituted nothing more than an attempt to return to work and that finding an overpayment of $17,000 was overly harsh.
 {¶ 35} 16. The commission refused relator's appeal and relator filed a motion for reconsideration on August 6, 2007.
 {¶ 36} 17. The commission found that relator had presented evidence of sufficient probative value to warrant the adjudication of his request for reconsideration regarding the alleged presence of a clear mistake of fact concerning the actual dates relator worked and that the SHO's order did not accurately address the overpayment. *Page 15 
 {¶ 37} 18. After further review, the commission determined that it did not have authority to exercise continuing jurisdiction pursuant to R.C. 4123.52 as relator had failed to meet this burden of proving that sufficient grounds existed to justify the exercise of continuing jurisdiction. As such, relator's request for reconsideration was denied and the SHO's order finding an overpayment and fraud remained in effect.
 {¶ 38} 19. Thereafter, relator filed the instant mandamus action in this court. Conclusions of Law:
 {¶ 39} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm.
(1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond FoundryCo. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v. Indus. Comm. (1981),68 Ohio St.2d 165.
 {¶ 40} It is undisputed that claimants are not permitted to work while receiving TTD compensation. The term "work" is not defined for workers' compensation purposes. However, it has been held that any remunerative activity outside a claimant's former position of employment precludes the payment of TTD compensation. State ex *Page 16 rel. Ney v. Niehaus (1987), 33 Ohio St.3d 118. Further, it has been held that where a claimant is involved in activities which are medically inconsistent with the alleged inability to return to the former position of employment, TTD compensation is barred regardless of whether or not the claimant is paid. See State ex rel. Parma Community Gen. Hosp. v.Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336. However, where the claimant's activities are not medically inconsistent, TTD compensation is barred only when the claimant is actually remunerated for those activities. Id. Furthermore, it has been held that work does not have to be full time or even regular part-time in order to foreclose the payment of TTD compensation; even sporadic employment can bar those benefits. See State ex rel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113.
 {¶ 41} Upon review of all the cases involving allegations that a claimant is working while receiving TTD compensation, one thing is clear — these cases must be examined on a case-by-case basis to determine whether or not the activities in which the claimant is involved constitute remunerative work activity of such a character that it bars the receipt of TTD compensation.
 {¶ 42} The factual pattern in the present case is remarkably similar to the factual situation presented in a case decided by this court,State ex rel. Griffith v. Radix Wire Co., Franklin App. No. 04AP-541,2005-Ohio-2200. In that case, Edward Griffith sustained a work-related injury on December 14, 2001 while employed as a mechanic. Griffith's treating physician, Dr. Fernando, certified that Griffith was unable to return to his former position of employment during the period December 17, 2001 through August 21, 2002. Dr. Fernando indicated that Griffith could perform light-duty work; however, the employer did not have any light-duty work available during this period. *Page 17 
 {¶ 43} In March 2002, the BWC received an anonymous tip that Griffith may be working at an auto body shop while receiving TTD compensation. As a result of the investigation, it was established that Griffith had received two checks: one dated December 29, 2001 in the amount of $288 and the other dated January 24, 2002 in the amount of $280. The shop owner stated that he had known Griffith for years and that Griffith had performed some work for him in early December 2001. The work consisted of putting up some walls and Griffith worked two-to-three days a week for three-to-four hours a day and the work was completed in December 2001. In early 2002, the shop owner asked Griffith if he could assist with delivering and picking-up vehicles at a nearby detail shop. He indicated further that Griffith helped answering telephones, cleaning up the shop, and putting away tools.
 {¶ 44} When Griffith was interviewed, he admitted that he had visited the body shop regularly from 1989 because he was friends with the owner. Griffith stated that he helped build a room at the shop from the middle of November until the first part of December 2001, and indicated that the check dated December 29, 2001 was for that work. Griffith admitted that he drove some vehicles, answered telephones, and put away some tools in early 2002, but indicated that the activity was not outside the restrictions given to him by Dr. Fernando. He indicated further that he stopped doing the work because his pain had begun to worsen.
 {¶ 45} The BWC filed a motion asking the commission to declare an overpayment of TTD compensation for the period December 17, 2001 through August 21, 2002 and order that the amounts be collected pursuant to the fraud provisions of R.C. 4123.511(J). *Page 18 
 {¶ 46} The matter was heard before a DHO on July 31, 2002 and resulted in an order granting the BWC's motion in part. The DHO denied the BWC's request to declare an overpayment for the period December 17 through December 29, 2001, on grounds that the BWC had failed to provide any proof that the December 29, 2001 payment was for work performed during Griffith's disability. However, for the period December 29, 2001 through January 24, 2002, the DHO declared an overpayment because Griffith had been assisting with cleaning and delivering cars during that time. For the period January 25 through August 21, 2002, the DHO denied the BWC's request to declare an overpayment of TTD compensation on grounds that the BWC had failed to demonstrate that Griffith received any compensation after January 24, 2002, and that the medical evidence on file demonstrated Griffith's ongoing disability. The DHO further denied the request for a finding of fraud on grounds that the BWC had not sustained its burden of proof. The DHO found that Griffith had been on light-duty work restrictions, which the employer could not accommodate, and that Griffith testified that the work he performed during the relevant period did not extend beyond his light-duty restrictions.
 {¶ 47} The BWC appealed and the matter was heard before an SHO on September 30, 2003. The SHO declared an overpayment of TTD compensation for the entire period of December 17, 2001 through August 21, 2002 and concluded that it was a result of fraud. The SHO stated that Griffith had been overpaid TTD compensation for the entire period because he had worked for a portion of that period and found that he retained the ability to continue with such work activity but for his receipt of compensation. The SHO further made a finding of fraud stating that Griffith induced the BWC to encourage damage to itself by wrongfully paying TTD compensation to which Griffith *Page 19 
was not entitled. The SHO noted that Griffith had signed numerous C-84s and disability checks despite the written warning against the receipt of TTD compensation while working.
 {¶ 48} Griffith filed a mandamus action in this court and this court granted the writ of mandamus ordering the commission (1) to vacate its order declaring an overpayment of TTD compensation paid to Griffith for the period December 17, 2001 through August 21, 2002, and finding that the overpayment should be collected pursuant to the fraud provisions of R.C. 4123.511(J), and (2) to find that TTD compensation was payable for the entire period and that no act of fraud was committed.
 {¶ 49} Applying the relevant case law dealing with the payment of TTD compensation to a claimant who allegedly is working, this court concluded that the BWC did not meet its burden of proof, granted the requested writ and ordered the commission to vacate its order finding an overpayment and fraud and ordering the commission to pay TTD compensation to Griffith. This court found the following facts to be especially relevant: (1) Griffith's physician of record had indicated that he was capable of performing light-duty work during the period at issue; (2) the BWC did not present any evidence that Griffith's activities were outside his restrictions; (3) Griffith did not receive substantial sums of money for the limited work activity he performed; and (4) when Griffith signed the C-84s, he had not yet received any TTD compensation and actually did not receive any compensation until after the work was completed.
 {¶ 50} The facts in this case present a remarkably similar scenario: (1) relator's treating physician had released him to participate in vocational rehabilitation and work conditioning; (2) the BWC did not present any evidence that relator's work activities *Page 20 
were outside his restrictions and/or abilities; (3) relator did not receive substantial sums of money for the very limited work activity he performed; and (4) the BWC never actually proved that relator performed any work activity while actually receiving payments of TTD compensation. More explicitly, the BWC issued an order dated June 3, 2005 awarding the payment of TTD compensation beginning November 1, 2004. Pursuant to R.C. 4123.511(H)(1), payments of compensation to a claimant as a result of any order issued by the administrator of the BWC are not paid until 14 days after the date of the order or the date when the employer has waived the right to appeal. In the present case, the BWC did not present any evidence that the employer waived its right to appeal earlier than 14 days after the June 3, 2005 date of the BWC order. As such, relator would not have been paid any TTD compensation before June 17, 2005. The only evidence in the record concerning the actual period relator worked is: (1) a notation in the physical therapy notes that he worked one time between June 6 and June 11, 2005; and (2) a notation in the SIU summary indicating that Jenny Warner (Human Resources VP for the YMCA) said relator worked during the pay period June 13 through June 26, 2005 as a building supervisor. Because the BWC failed to present any evidence of the actual dates relator worked for the YMCA in June 2005, the BWC did not establish that relator actually worked while receiving TTD compensation.
 {¶ 51} Just as this court determined in the Griffith case that the commission had abused its discretion by finding an overpayment of TTD compensation and making a finding of fraud against Griffith, it is likewise this magistrate's decision that the facts of this case are so similar to the facts of the Griffith case that the commission did abuse its discretion here in declaring an overpayment of TTD compensation and making a finding *Page 21 
of fraud against relator. As such, it is this magistrate's decision that this court should issue a writ of mandamus ordering the commission to vacate its order declaring an overpayment of TTD compensation paid to relator for the period June 6, 2005 through November 9, 2006 with the exception of subtracting from that award the amount of $249.38 representing the amount of compensation relator was actually paid by the YMCA, and vacate the finding that the overpayment should be collected pursuant to the fraud provisions of R.C. 4123.511(J), and ordering the commission to award relator TTD compensation from June 6, 2005 through November 9, 2006 minus the $249.38 paid to relator. *Page 1